UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES OF AMERICA

                -v-

                                                21 CR 101 (JFB)

LENIZ ESCOBAR,

              Defendant.
-------------------------------------------------------x

## LENIZ ESCOBAR'S MEMORANDUM IN SUPPORT OF HER MOTIONS FOR A JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, A NEW TRIAL.

                                                        JESSE M. SIEGEL
                                                        *Attorney of Record for*
                                                        *Defendant Leniz Escobar*

                                                        299 Broadway, Suite 800
                                                        New York, NY 10007
                                                        212-207-9009

**PRELIMINARY STATEMENT**

Defendant Leniz Escobar respectfully submits this memorandum in support of her motions for a judgment of acquittal, pursuant to Fed.R.Crim.P. 29, or, in the alternative, a new trial, pursuant to Fed.R.Crim.P. 33, which were deemed filed orally following the jury's verdict. Below, we argue the evidence was insufficient to establish Ms. Escobar acted with the purpose of maintaining or increasing her position in the MS-13, or had a "VICAR motive," as required for conviction under Counts Two through Five.

**A. Applicable Law.**

Under F.R.Cr.P. 29, the court is required to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." F.R.Cr.P. 29(a). In doing so, it must assess "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "'[A]ll reasonable inferences are to be resolved in favor of the prosecution and the trial court is required to view the evidence in the light most favorable to the Government with respect to each element of the offense.'" *United States v. Artuso*, 618 F.2d 192, 195 (2d Cir. 1980) (quoting *United States v. Skinner*, 425 F.2d 552, 554 (D.C.Cir. 1970)).

A motion for a new trial pursuant to F.R.Cr.P. 33 is assessed under a less exacting standard than a Rule 29 motion. The trial judge is required to independently weigh the evidence as if he were a juror, and grant a new trial "if the interest of justice so requires." In evaluating such a motion, the Court "must examine the entire case, take into account all facts and

1

circumstances, and make an objective evaluation." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). The court should grant the motion if there is a "real concern that an innocent person may have been convicted." *Id.*

### B. The evidence was insufficient to establish Ms. Escobar committed the four murders "for the purpose of maintaining and increasing position in the MS-13."

Ms. Escobar was convicted in Counts Two through Five of the trial indictment of committing the murders of each of the four victims, "for the purpose of maintaining and increasing position in the MS-13," in violation of 18 U.S.C. § 1959(a)(1), 2 and 3551 et seq.

The government presented evidence that Ms. Escobar was an "associate" of the MS-13. As a woman, she was prevented from becoming a member of the gang. Witnesses testified that female associates of the gang did such things as transporting drugs and weapons, and luring members of rival gangs to places where they could be attacked.

Although Ms. Escobar was the girlfriend of a high-ranking member of the "Brentwood clique," Jeffrey Amador, there was little evidence that, prior to the murders of the four victims, she had ever done anything to help the MS-13. One witness, David Gaitan-Rivera, testified that, after Amador was arrested in February 2017, she was permitted to keep and use a car maintained by the Brentwood clique, provided she paid the insurance for it. Other than smoking marijuana, there was no evidence she had previously committed any crimes.

There was no evidence she had previously done anything to assist members of the "Leeward clique," who were primarily responsible for the murders. Although there was testimony that she had attended a meeting of the group, her main activity with them had been smoking marijuana.

2

No testimony was presented that, to assist the gang, Ms. Escobar ever transported, sold or obtained drugs, or obtained or transported weapons, or, prior to the events charged here, located victims or lured them to places where they could be attacked.

There was no direct evidence that Ms. Escobar had acted with the purpose of maintaining and increasing her position in the MS-13. In one of her recorded conversations with Amador while he was in jail, she said she did not know why she had acted.

The closest the government came to presenting such evidence was that each of the three cooperating witnesses – Sergio Vladimir Segovia-Pineda, Gaitan, and Keyli Gomez – testified that by doing favors for members of MS-13, a female associate could earn "trust and respect." None of them explained what that meant for Ms. Escobar, especially since her status as an associate of MS-13 derived from being Amador's girlfriend, and Amador, as the recorded calls made clear, did not approve of her being involved in such criminal activities.

For these reasons, the evidence was insufficient to establish that Ms. Escobar acted "for the purpose of maintaining and increasing position in the MS-13."

Title 18, United States Code, section 1959(a) provides, "Whoever … for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity," commits specified violent crimes (including murder) shall be punished as set forth therein. To sustain a "VICAR" conviction, the government must prove beyond a reasonable doubt five elements: "(1) that the organization was a RICO enterprise, (2) that the enterprise was engaged in racketeering activity, (3) that the defendant in question had a position in the enterprise, (4) that the defendant committed the alleged crime of violence, and (5) that his general purpose in so doing was to maintain or increase his position in the enterprise." *United States v. Concepcion*, 983 F.2d 369 (2d Cir. 1992).

3

Self-promotion need not be a defendant's "only, or even [] primary, concern, if it was committed 'as an integral aspect of membership' in the enterprise." *United States v. Thai*, 29 F.3d 785, 817 (2d Cir. 1994) (quoting *Concepcion*, 983 F.2d at 381). However, a "jury must be able to reasonably infer from the evidence that 'the defendant committed his violent crime because *he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership*.'" *United States v. Jones*, 291 F.Supp.2d 78, 86 (D.Conn. 2003) (quoting *Concepcion*, 983 F.2d at 381) (emphasis in original). In *Concepcion*, the Court reviewed the legislative history of section 1959, and noted the requirement that a violent act have been committed for the purpose of maintaining or increasing position in the racketeering enterprise "was included as a means of proscribing murder and other violent crimes committed "as an integral aspect of membership in such enterprises." *Concepcion*, 983 F.2d at 381 (citations to legislative record omitted).

Most cases construing the need for a VICAR motive involve defendants who were *members* of criminal organizations rather than, as here, "associates" of such racketeering enterprises. *See, e.g., Concepcion*, *supra*, 983 F.2d at 375 (appellants Ricardo Melendez ran the organization, Manuel Concepcion was a lieutenant responsible for retail drug distribution, and Ricardo Aponte was an enforcer for the organization); *Thai*, *supra*, 29 F.3d 785 (2d Cir. 1994) (defendant David Thai was the leader of a Vietnamese street gang named "Born to Kill" or "BTK"); *United States v. Diaz,* 176 F.3d 52, 95-96 (appellants challenging the sufficiency of the evidence as to their VICAR motives were all members of the Latin Kings, and one was a leader); *United States v. Dhinsa*, 243 F.3d 635, 643, 671 (2d Cir. 2001) (appellant was the "self-professed leader of the 'Singh Enterprise,' a vast racketeering organization"); *United States v. Reyes*, 157 F.3d 949, 955 (2d Cir. 1998) (appellant was head of a large drug-distribution

4

organization); *United States v. Rosa*, 11 F.3d 315, 340-41 (2d Cir. 1993) (appellant was a leader of drug organization).

In these cases, courts engaged in detailed analyses to determine whether defendants committed violent acts because they were expected to do so as a result of their positions within the racketeering organizations, or as a way of improving their positions within the organizations, on the one hand, or, on the other, for different, often personal, reasons. In *Thai*, for example, the defendant was the leader of a gang that principally committed robberies and extortion of Asian-owned businesses. He was paid $10,000.00 to bomb a Chinatown restaurant, and hired an associate of the gang to do it. After the bombing, Thai learned the wrong restaurant had been bombed. He then sent other gang members to bomb the intended restaurant, but they were arrested as they approached it. Thai and the other members were charged with conspiracy to commit murder under VICAR.

The Court reversed, finding the evidence insufficient for the jury to conclude Thai's motive was to maintain or increase his position in BTK; the evidence showed his motive was "purely mercenary." 29 F.3d at 818. The Court noted, "There was no evidence … that the bombing was to be a response to any threat to the BTK organization or to Thai's position as BTK's leader, nor any evidence that he thought that as a leader he would be expected to bomb the restaurant." Further, "And though Thai paid the expenses of gang members, any suggestion that he undertook to bomb the restaurant to obtain money in order to carry out that responsibility would be entirely speculative, since the government concedes that there was no evidence as to Thai's intended use of the money." *Id.*

The Court rejected the argument that Thai carried out the second bombing to maintain his position in the gang after the first bombing, as the government had not provided any evidence

5

that gang members were concerned about his leadership after the erroneous first bombing. It held,

> [T]he conclusion that Thai was motivated to accept the second bombing assignment by a desire to maintain or increase his position would have to have been based on pure speculation. While a defendant's § 1959 conviction is to be affirmed if a motivation to maintain or increase his position may be reasonably inferred from the evidence, such a conviction may not be affirmed where, as here, that inference is based on no more than guesswork.

*Id.* at 818-19.

Here, a conclusion that Ms. Escobar's motivation was to maintain or increase her position in the racketeering enterprise is even more speculative and based on guesswork than in *Thai*. As a woman, she could not become a member of MS-13. Therefore, the most she could have hoped for was to be allowed to continue as an "associate," with whatever benefits that might confer.

Even assuming, *arguendo*, that maintaining one's position as an associate is sufficient to qualify as a VICAR motive, Ms. Escobar's status as an associate of MS-13 was based entirely on being Amador's girlfriend. Because of that relationship, she was untouchable; Segovia-Pineda complained that he was unable to do anything to her when she disparaged the Leeward clique for that reason. And, as the jail calls with Amador show, he was unhappy with her involvement in the murders.

Thus, the conclusion that her motive was to be able to remain as an associate is contradicted by the evidence that her status not only did not depend on participating in the murders, but was hurt by it; at the very least, the conclusion is based on speculation and guesswork.

The government's claim that Ms. Escobar would receive "trust and respect" is far too vague to qualify as a sufficient VICAR motive. Indeed, in every case in which commission of a

6

crime was found insufficiently connected to a defendant's position in an enterprise to qualify as a VICAR motive, it could have been argued that the defendant would receive "trust and respect" by committing the crime. In *Thai*, *supra*, for example, the defendant certainly would have received "trust and respect" for making sure that the botched contract to bomb a restaurant was done correctly a second time. This could only have enhanced his reputation as someone who could be trusted to perform a contract properly, which would have been to the benefit of the gang he led and could only have enhanced his leadership position. Yet, the Court found such a conclusion too speculative, especially since there was no evidence that Thai's leadership position was in jeopardy.

Similarly, here, there was no evidence for a reasonable jury to conclude that Ms. Escobar's status as an associate was in jeopardy. So long as she remained Amador's girlfriend, her status was ensured, and there was no evidence that her relationship was in danger. There was no evidence that Ms. Escobar had anything to gain in terms of her position as an associate from participating in the murders.

In *United States v. Jones*, 291 F.Supp.2d 78 (D.Conn. 2003), Jones, a leader of a drug organization (the "Enterprise"), killed Lawrence, who had made disrespectful comments to Jones' girlfriend in front of other people, which were also disrespectful to Jones. Although the evidence was more than sufficient to support a murder conviction under Connecticut state law, the district court found it insufficient to establish a VICAR motive under section 1959. In particular, the court rejected the government's argument that "because Jones cultivated a reputation for violence at [the housing project his gang controlled] to gain and maintain respect, a jury could reasonably infer that his general purpose in murdering Lawrence was to maintain or increase his position in the Enterprise." *Id.* at 87-88. The government argued, "Jones was

7

required by his position and membership in the Enterprise to react to Lawrence's disrespect with violence," as, "A failure to retaliate would erode his position as leader of the Enterprise, weaken his and the Enterprise's reputation for violence, and compromise the Enterprise's ability to maintain its hold on the lucrative drug business in the [locations it controlled]." *Id.* at 88.

The court was not persuaded a jury could reasonably infer Jones acted with the requisite "Enterprise-related motive," as there was "no evidence to support the government's strained inference that Jones had a generalized need to use violence in response to all acts of disrespect – regardless of whether the disrespect was directed at him personally or was related to the affairs of the Enterprise – in order to maintain his position in the Enterprise or to further the Enterprise's objectives."  The court found, "Without such evidence, this inference is based only on speculation." *Id.*

Here, the jury's conclusion that Ms. Escobar needed to participate in the murders in order to maintain her position as an associate of the MS-13 is also based only on speculation.

## CONCLUSION

For the forgoing reasons, we ask the Court to grant Ms. Escobar's motions for a judgment of acquittal or, in the alternative, a new trial, on Counts Two through Five.

Dated: New York, New York
May 23, 2022

                                              Respectfully submitted,

                                              JESSE M. SIEGEL
                                              *Attorney of Record for*
                                              *Defendant Leniz Escobar*

                                              299 Broadway, Suite 800
                                              New York, NY 10007
                                              212-207-9009